UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NUMBER   11-0068** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **WILLIE J. JENKINS, JR.** | * | **MAG. JUDGE KAREN L. HAYES** |

### REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress [doc. # 27] filed by defendant Willie Jenkins, Jr.  For reasons stated below, it is recommended that the motion be **DENIED.**

On April 23, 2010, City of Monroe police officer, Corporal Scotty R. Sadler, with the assistance of several other law enforcement officers, executed an arrest warrant for Willie Jenkins, Jr. at 3811 Spurgeon Drive, Apartment Number 2, Monroe, Louisiana.  After taking Jenkins into custody, the police officers transported Jenkins to his residence on Selman Drive, where a search of the apartment uncovered various quantities of Ecstasy and high grade marijuana.  The officers also recovered a Hi Point, model JHP, .45 caliber handgun, with an obliterated serial number, that Jenkins kept in a locked trunk in a closet of his apartment.  Several weeks later, while still in custody on the pending state charges, Jenkins provided incriminating statements concerning the firearm to a Monroe police detective, in the officer's capacity as an ATF Task Force agent.

On March 24, 2011, a federal grand jury returned a two count indictment against Willie J. Jenkins, Jr. for felon in possession of a firearm with a removed, obliterated, and altered serial number, and ammunition, to wit:  a Hi Point, model JHP, .45 ACP caliber, semi-automatic pistol,

magazines and ammunition, all in violation of 18 U.S.C. §§ 922(g)(1) & 924(a)(2), 924(k), and 924(a)(1). The government also seeks forfeiture of the foregoing firearm and ammunition.

On July 25, 2011, Jenkins, via counsel, filed the instant motion to suppress any statements, admissions, or confessions that he may have made, as well as all physical evidence that was seized pursuant to the unlawful search of his house. Following a delay for briefing and an August 15, 2011, evidentiary hearing, the matter is now before the court.[1]

## Hearing Testimony and Exhibits

The following facts were established via testimony presented at the August 15, 2011, hearing held in this matter.

Corporal Scotty Sadler is a ten year veteran with the City of Monroe Police Department. He attended the North Delta Regional Training Academy for police officers. For most of his career, Sadler was assigned to the Special Neighborhood Action Program ("SNAP") Team, which is a proactive unit that helps the community with neighborhood problems, including narcotics.

Corporal Dennis Wall is a City of Monroe police officer assigned to the department's street crimes unit, mobile enforcement team, and SNAP team. He has a total of approximately ten years experience in law enforcement.

Casey Baker and Triche Passman are detectives with the City of Monroe Police Department. Baker has eight years of seniority; Passman has 19 years of law enforcement experience. Passman also serves as an ATF Task Force agent.

In January 2010, a confidential informant notified Officer Sadler that Willie J. Jenkins was distributing marijuana out of his residence at 3811 Spurgeon Drive, Apartment Number 2.

---

[1] The government submitted a post-hearing letter memorandum dated August 31, 2011.

*See* Arrest Warrant Affidavit, Gov.'t Exh. 1. With the assistance of this confidential informant, Sadler orchestrated two controlled buys of marijuana from Jenkins' residence in January and February 2010. *Id*. On March 17, 2010, Sadler successfully applied to 4th Judicial District Court Judge Wilson Rambo for a warrant for Jenkins' arrest. (Arrest Warrant, Gov.'t Exh. 1).

Over one month later – on April 23, 2010, Sadler observed Jenkins' vehicle parked in front of the residence at 3511 Spurgeon Drive.[2] Accordingly, Sadler called for back-up, and departed the area to await their arrival. At around 18:00, Sadler, together with five to ten other officers, returned to the residence, only to discover that Jenkins' car was gone. A short while later, however, the car returned; Sadler observed Jenkins and a female exit the vehicle and enter apartment number 2.

The police officers approached the residence and knocked on the door. Tammy Smith answered the door, whereupon Sadler advised her that he needed to speak to Willie Jenkins.[3] Smith turned her head and called out to Jenkins that the police were there to talk to him. Sadler then heard a loud commotion which sounded like it was coming from the bathroom. Fearing for his safety, Sadler immediately entered the apartment, and directed the other officers to apprehend Jenkins. They encountered Jenkins in the bathroom, and formally placed him under arrest. After the officers removed Jenkins from the residence, Sadler advised Jenkins of his *Miranda* rights, which Jenkins said he understood.

After removing Jenkins from the residence, Sadler returned inside to speak with Ms. Smith, who advised him that Jenkins used to live with her, but she had kicked him out. Smith

---

[2] It took Sadler over one month to execute the arrest warrant because, unbeknownst to him, Jenkins had changed residences.

[3] The officers were dressed in their standard SNAP uniforms, consisting of black BDU pants, with a black emblem, and an outer police vest.

explained that Jenkins had moved to the Premier Apartments, but she did not know the apartment number. She then provided written consent to search her apartment.[4] Officer Wall participated in the search, and uncovered some Ecstasy pills hidden in the bathroom. The search also produced two small baggies of marijuana.

Sadler next spoke with Jenkins and told him about the illicit substances they had discovered in the bathroom. Jenkins remained somber, and conceded that the officers had found all of the drugs that were inside of that apartment. Sadler asked Jenkins what his new address was, and whether he possessed any illicit substances over there. Sadler explained to Jenkins that he would like to search his apartment for illegal contraband. Jenkins replied that he resided at 355 Selman Drive, Apartment 28. The officers proceeded to Jenkins' new residence.

Officer Dennis Wall transported Jenkins to his residence on Selman Drive.[5] Wall's unit did not have a "cage," separating the front and rear seats, so Jenkins sat in the front passenger seat. During the drive to the apartment, which lasted less than five minutes, Jenkins admitted to Wall that he had some more Ecstasy tablets, and told him where to find them inside of the residence.[6] Jenkins also told Wall to "go ahead" and search his apartment – he "didn't have a problem with it." After they arrived at the apartment, Wall removed Jenkins from the car because it is uncomfortable to remained seated in a car while handcuffed.

---

[4] The parties did not introduce the consent to search form into the record.

[5] Corporal Matt Schmitz of the Monroe Police Department drove Jenkins' car to his apartment, as a courtesy so it would not be left on the street following his arrest. He did not recall how he obtained the car keys, or what he did with the keys after he arrived at Jenkins' residence.
    Sadler testified that the officers searched Jenkins' car, but did not find anything. He was sure that he obtained Jenkins' consent to search the car, but did not specifically recall those details. He further explained that he would not have searched the car without Jenkins' consent.

[6] Wall did not recall who initiated the conversation.

4

Wall relayed Jenkins' admissions to Sadler, who then queried Jenkins about them. Jenkins confirmed to Sadler that he had 55 Ecstasy tablets in a brown paper bag in the refrigerator. Sadler asked Jenkins whether he minded if the officers went inside and retrieved the drugs. Jenkins said that he did not mind. Accordingly, Sadler used Jenkins' keys to enter the apartment, went straight to the refrigerator, opened the refrigerator door, and observed a pickle jar with marijuana stuffed inside of it. Sadler also found the 55 Ecstasy tablets inside of a brown paper bag, as Jenkins had described.

Sadler returned outside and confronted Jenkins about the additional contraband that he had uncovered in the refrigerator. Sadler told Jenkins that although he found the Ecstasy, he also found marijuana that Jenkins had failed to mention. Sadler asked Jenkins whether there was anything else that he had not disclosed. Jenkins hung his head in shame, and admitted that there was a gun in a foot locker in his closet. He further stated that the key to the locker was on the key chain that the officers already had.

Sadler gave the key chain to Officer Baker and advised him that they had consent to search. Baker used one of the keys to open the footlocker where he found a loaded Hi-Point Model JHP .45 caliber firearm, with an obliterated serial number; additional loaded magazine(s) for the firearm; an additional 17.1 grams of marijuana in two bags; and digital scales.

Throughout their interaction, Jenkins never indicated to Sadler that he did not wish to discuss these matters with him. Jenkins remained very cooperative with the officers, other than his refusal to disclose his source for the narcotics. In fact, Sadler characterized Jenkins as a "nice guy." Jenkins told the officers that he bought the marijuana for $500 per ounce and sold it for $25 per gram "to make ends meet." Sadler stated that none of the officers verbally or physically intimidated Jenkins in an effort to compel him to speak or to obtain his consent to search his apartment. Moreover, Jenkins did not appear to the officers to be under the influence of drugs or

suffering from any mental disability or slowness. Sadler also did not make any promises to Jenkins to induce his incriminating statements or to obtain his consent to search the second apartment. However, there is no evidence that anyone advised Jenkins that he had the right to withhold consent to search his apartment.[7]

Later that day, Corporal Sadler completed paperwork setting forth the circumstances of the arrest and seizure of contraband. (Affidavit of Probable Cause for Arrest Without Warrant; Gov.'t Exh. 2). In his written recitation of facts, however, Sadler did not document that the officers obtained consent to search both apartments and the car. *Id.*[8]

Jenkins briefly testified at the hearing that he did not give consent or permission to search either his vehicle or his Selman Drive residence. He explained that the officers sought his permission to search, but he told them "no." Jenkins acknowledged that he is a high school graduate, with at least two semesters of college.

On the afternoon of May 12, 2010, Detective Passman interviewed Jenkins at the detention facility. Passman identified himself as an ATF task force officer and orally advised Jenkins of unspecified Miranda rights. Jenkins agreed to speak with Passman.[9] Jenkins told Passman that several years earlier, he paid $100 for the Hi-Point .45 pistol that the police found in his foot locker. He said that he needed the gun because there had been several burglaries in his

---

[7] Although the officers had consent to search forms – and, in fact, apparently used one to obtain Ms. Smith's consent to search her apartment – they did not show a form to Jenkins. Sadler testified that the officers did not offer Jenkins a consent to search form because he was in custody. He explained that un-cuffing Jenkins would have presented a security risk. Sadler testified that from his past his experience, a bad situation can develop once an arrestee realizes that he is going to prison.

[8] The "facts" section of the form indicates that Sadler continued his narrative on the "back" of the form. The copy in evidence, however, contains only the front side of the form.

[9] The interview was not recorded.

neighborhood and at his house. Jenkins told Passman that he knew the serial number on the gun had been "scratched up" at the time that he purchased it.

Passman testified that Jenkins had a prior conviction for possession of marijuana, with intent to distribute. He further opined that Jenkins appeared intelligent. Jenkins did not complain to Passman that the search of his apartment was unlawful. Passman was not involved in Jenkins' arrest or the search of his apartment.

## Law and Analysis

**I.     The Officers Seized the Firearm and Other Contraband Pursuant to a Valid Exception to the Search Warrant Requirement**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citation omitted). However, when a law enforcement officer acts without a warrant, the government bears the burden of proving that the search was valid. *Id*.

"Warrantless searches and seizures inside a home are presumptively unreasonable . . ." *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010), *cert. denied*, ___ U.S. ___, 131 S.Ct. 158 (2010) (citations and internal quotation marks omitted). Nonetheless, "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Id*. To meet this exception, the government must establish (1) that consent was given, (2) voluntarily, (3) by a party with actual or apparent authority, and (4) that the search was within the scope of the consent. *United States v. Freeman*, 482 F.3d 829 (5th Cir. 2007). The first two inquiries are determined based on the totality of the circumstances; whereas the court weighs the latter two considerations under a reasonable officer

standard. *Id*.

Needless to say, because the basis for the instant indictment stems from defendant's possession of a Hi-Point .45 semi-automatic pistol, defendant's motion specifically seeks to exclude this item from evidence. Accordingly, the focal point of the court's analysis will be the officers' search of defendant's Selman Drive apartment.[10]

At the outset, the court must resolve whether Jenkins, in fact, consented to the officers' search of his apartment. As recounted earlier, Jenkins stated that he did not give the officers permission to search his Selman Drive residence or his car.[11] He further explained that although the officers asked him for permission to search, he told them "no." Conversely, the officers testified that Jenkins authorized their search of his Selman Drive residence. Corporal Sadler further testified Jenkins consented to the search of his car because they would not have searched his car without his consent.

The court resolves this credibility issue in favor of the government witnesses. In so doing, the court finds that the officers' version of events is more plausible. If, as defendant testified, he did not consent to the search(es) by the officers, the most likely scenario would have been because the officers never sought his permission. Jenkins admitted, however, that the officers solicited his permission to search, albeit unsuccessfully. Moreover, although not inquired into by either attorney at the hearing, Jenkins did not deny that he told the officers that he possessed additional contraband in his Selman Drive apartment, and explained where they

---

[10] Defendant does not specifically challenge the search of the Spurgeon Drive apartment. To the extent that the search and seizure of contraband in that apartment is relevant to the searches that occurred later that day, the uniform evidence before the court supports a finding that the officers obtained Ms. Smith's valid consent to search the apartment.

[11] Because the officers did not find any contraband in Jenkins' car, the search of the vehicle is only relevant insofar as it sheds light on whether Jenkins consented to the search of his apartment, and whether his consent was voluntarily given.

could find it. It would be anomalous for someone with Jenkins' educational background and demeanor to confess to possession of additional contraband in his apartment, but then refuse to permit the officers to retrieve the items that he had just disclosed.

Moreover, if, as Jenkins claims, the officers searched his car and apartment over his objections, it is implausible that someone with Jenkins' educational background and apparent intelligence would seemingly gloss over the Fourth Amendment violation by making additional incriminating statements to law enforcement personnel about one of the seized items – without so much as a murmur about the purportedly unlawful search and seizure. Thus, under the totality of the circumstances, the court finds that Jenkins effectively consented to the search of his apartment and car.

Voluntariness of consent is determined by the totality of the circumstances, comprised of six factors:

(1) the voluntariness of the defendant's custodial status;

(2) the presence of coercive police procedures;

(3) the extent and level of the defendant's cooperation with the police;

(4) the defendant's awareness of his right to refuse to consent;

(5) the defendant's education and intelligence; and

(6) the defendant's belief that no incriminating evidence will be found.

*United States v. Martinez*, 2011 WL 72195, 2 (5th Cir. Jan. 6, 2011) (unpubl.) (citation and internal quotation marks omitted).

Although all six factors are relevant, no single factor is dispositive. *Id*.

Applying the foregoing considerations here, the court finds that at the time of the consent, Jenkins was in handcuffs and under arrest. Thus, the court construes this factor against the government. Second, although there were at least five law enforcement officers involved in

9

Jenkins' arrest and ensuing search of his apartment, there is no indication that any weapons were pointed at him or that they threatened, or otherwise shouted at him while soliciting him consent. In fact, they drove his car to his apartment as a courtesy. Moreover, Jenkins was cooperating with the police: he conceded the presence of contraband in his apartment and told them where to find it. At the hearing, the officers described Jenkins as very cooperative and nice. Jenkins also acknowledged that he had no complaints about the actions of the police officers. Furthermore, Jenkins verbally consented to the search in surroundings familiar to him, i.e. in front of his apartment. *See United States v. Riley*, 968 F.2d 422, 426-427 (5th Cir. 1992).

There is no evidence that Jenkins was aware of his right to withhold consent to search. However, he had been arrested previously. Moreover, he completed at least one year of college, appeared intelligent to the officers, and more than competent on the witness stand.

Finally, Jenkins clearly believed that incriminating evidence would be found because he admitted to the officers where they could find the contraband hidden in his apartment. Thus, although this factor technically leans against a finding of voluntariness, it does so nominally. As the Fifth Circuit remarked in *Martinez*, "it would be significantly more likely for a defendant to consent voluntarily to a search that he knew would produce evidence of a crime if he had already voluntarily admitted to committing the crime." *Martinez, supra*.

The court finds troubling the fact that the officers set off for Jenkins' Selman Drive apartment, having professed their desire to search the apartment, even before they obtained consent to search. Indeed, "consent must be given voluntarily and not simply in acquiescence to a claim of lawful authority . . ." *United States v. Lopez*, 911 F.2d 1006, 1010 (5th Cir. 1990) (citation omitted). Fortunately for the officers, however, Jenkins consented to the search while en route to his apartment. Moreover, Sadler clarified at the hearing that Jenkins did not disclose his address until *after* Sadler told him that he would like to search the apartment. This sequence

of events suggests that Jenkins was at least amenable to a search of his apartment.

Accordingly, upon consideration of the totality of the circumstances, the undersigned finds that Jenkins' consent to search was voluntary. *See e.g., United States v. Estrada*, 459 F.3d 627 (5th Cir. 2006) (consent freely given where defendants were calm and cooperative and police did not employ coercive tactics); *United States v. Timoteo*, 353 Fed. Appx. 968, *6 (5th Cir. Dec. 1, 2009) (unpubl.) (arrestee's verbal consent to a limited search was voluntary, where he was very cooperative and despite his refusal to sign written consent).

There is no dispute that Jenkins had actual or apparent authority to consent to the search of his Selman Drive apartment and car. Thus, the remaining inquiry is whether the search exceeded the scope of Jenkins' consent.

"When the police are relying upon consent . . . they have no more authority than they have apparently been given by the consent." *United States v. Fields*, 131 Fed. App'x 42, 44 (5th Cir. 2005). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Courts must "take account of any express or implied limitations or qualifications attending that consent which establish the permissible scope . . ." *Fields*, 131 Fed. App'x at 44. For example, consent to search may be limited in terms of time, duration, area, or intensity. *United States v. Green*, 388 Fed. Appx. 375, 382-83 (5th Cir. July 1, 2010) (unpubl.) (citation omitted). Nonetheless, the failure to object to a search is "an indication that the search was within the scope of the initial consent." *See e.g. United States v. McSween*, 53 F.3d 684, 688 (5th Cir. 1995); *United States v. Mejia*, 953 F.2d 461, 466 (9th Cir. 1991).

Here, there is no question that the scope of Jenkins' initial consent extended to the contraband that Sadler found in Jenkins' refrigerator. Jenkins told the officers about the Ecstasy

tablets in the refrigerator; he also told Officer Wall to "go ahead" and search his apartment – he "didn't have a problem with it." To the extent that Jenkins' consent did not explicitly extend to the marijuana in the pickle jar, the officers permissibly seized this evidence pursuant to the plain view doctrine. *United States v. Paige*, 136 F.3d 1012, 1023 (5th Cir. 1998).

As discussed *supra*, however, the illegal drugs in the refrigerator are not the focus of this indictment or motion; rather, it is the firearm that the officers uncovered in a locked foot locker. In this regard, Corporal Sadler did not testify that Jenkins gave him explicit or renewed permission to search the foot locker. Upon prompting by Sadler, however, Jenkins volunteered that there was a firearm secreted in his foot locker. Jenkins also told the officers that the key on his key chain opened the lock. Furthermore, there is no evidence that Jenkins sought to limit or retract the scope of his previously granted consent to search.

Given Jenkins' ongoing cooperation with the authorities, any reasonable officer would have understood that Jenkins' words and actions constituted consent to search the foot locker, and to seize the firearm hidden therein. *See Green, supra* (no limitation on consent to search where defendant told officers that there was drugs in the room, gave them the key to the room, and did not specify any areas that were off limits); *United States v. Mendez*, 431 F.3d 420, 427 (5th Cir. 2005) (search did not exceed scope of consent where defendant made no attempt to limit the scope of his consent, and he never objected to additional agents participating in the search).

Accordingly, the undersigned finds that the government lawfully seized the Hi Point, model JHP, .45 ACP caliber, semi-automatic pistol, magazines and ammunition pursuant to defendant's valid consent.

**II.     The Fifth and Sixth Amendments do not Bar the Admission of Jenkins' Incriminating Statements at Trial**

The admissibility of pre-indictment confessions is regulated by both the Fifth

Amendment Privilege against Compelled Self-incrimination ("Fifth Amendment") and the Due Process Clause of the Fifth and/or Fourteenth Amendments ("Due Process Clause"). The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself . . ." U.S. CONST. AMEND. V. In *Miranda v. Arizona*, the Supreme Court held that

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612 (1966) (footnote omitted). The central principle established by *Miranda* is that if the police question an in-custody suspect without informing him of the rights specified therein, then his responses cannot be introduced into evidence to establish his guilt. *Berkemer v. McCarty*, 468 U.S. 420, 429, 104 S.Ct. 3138, 3144 (1984). "[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained. Conversely, giving the warnings and getting waiver has generally produced a virtual ticket of admissibility . . ." *Missouri v. Seibert*, 542 U.S. 600, 609, 124 S.Ct. 2601, 2608 (2004) (footnote omitted).

In addition, a criminal defendant is "deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession and even though there is ample evidence aside from the confession to support the conviction." *Lego v. Twomey*, 404 U.S. 477, 483-484, 92 S.Ct. 619, 623- 624

(1972) (citations and internal quotation marks omitted). The defendant is entitled to "object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession." *Id*. The sole purpose of the hearing is to determine whether the confession was coerced. *Id*.

The government must establish by a preponderance of the evidence the voluntariness of an incriminating statement and the *Miranda* waiver. *Colorado v. Connelly*, 479 U.S. 157, 169, 107 S.Ct. 515 (1986); *Lego, supra; United States v. Mullin*, 178 F.3d 334, 341 (5th Cir. 1999). "A confession is voluntary if, under the totality of the circumstances, the statement is the product of the accused's free and rational choice." *United States v. Broussard*, 80 F.3d 1025, 1033 (5th Cir.1996).

Nevertheless, in *Connelly*, the Supreme Court clarified that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Connelly, supra*. Equally, "[t]he sole concern of the Fifth Amendment, on which Miranda was based, is governmental coercion." *Id*. Thus, the voluntariness of a Miranda waiver and resulting confession depend upon the absence of police overreaching, not on "free choice." *Id*.

The Fifth Circuit remarked that after *Connelly*, the relevant test no longer focuses on the defendant's free will. *United States v. Raymer*, 876 F.2d 383, 386 -387 (5th Cir. 1989) (citations omitted). "Instead, the focus is on the presence or absence of police coercion." *Id*. Although a defendant's mental condition still figures into the voluntariness calculus, there must be an element of official overreaching to render a confession involuntary under the Constitution. *Id*. In other words, the police must exploit the defendant's mental condition. *See Raymer, supra*.

Applying the foregoing considerations here, the undersigned finds that the officers advised Jenkins of his *Miranda* rights at the time of his arrest, and immediately prior to the

14

questioning on May 12, 2010.[12] The record is devoid of any allegations or evidence of coercive police tactics. Moreover, there are no issues regarding Jenkins' mental competence or lucidity at the time that he made the incriminating statements.

In the absence of police "overreaching" or coercion and upon consideration of the totality of the circumstances, the undersigned finds that the government has demonstrated by a preponderance of the evidence the voluntariness of Jenkins' incriminating statement(s) and Miranda waiver.

At the hearing, defense counsel implied, via cross-examination, that Agent Passman may have violated Jenkins' Sixth Amendment rights by questioning him after his right to counsel had attached and had been invoked. However, the Sixth Amendment right to counsel is offense specific. *United States v. Avants*, 278 F.3d 510, 522 (5th Cir. 2002) (citation omitted). Moreover, "a federal offense and a state offense do not constitute the 'same offense' under the Sixth Amendment—even if the offenses are identical in their respective elements—because they are violations of the laws of two separate sovereigns." *Id*. Thus, to the extent that Jenkins' right to counsel attached for purposes of his state court charges, it had not attached at the time of Passman's interview with respect to the instant federal charges. Defendant's implied argument is baseless.

## Conclusion

For the above-stated reasons,

**IT IS RECOMMENDED** that the motion to suppress [doc. # 27] filed by defendant Willie Jenkins, Jr. be **DENIED.**

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have

---

[12] Although Agent Passman did not specify at the hearing the substance of the *Miranda* rights that he recited, Jenkins does not question the sufficiency of those warnings.

**fourteen(14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, at Monroe, Louisiana, this 12th day of September 2011.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE